Filed 3/25/14  In re M.A. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re M.A., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,　Plaintiff and Respondent,　v.　C.L.,　Defendant and Appellant. | D064492　(Super. Ct. No. J518127) |

APPEAL from a judgment of the Superior Court of San Diego County, Carol

Isackson, Judge.  Affirmed.

Joseph T. Tavano, under appointment by the Court of Appeal, for Defendant and

Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County

Counsel, and Dana C. Shoffner, Deputy County Counsel, for Plaintiff and Respondent.

Karen McCready, under appointment by the Court of Appeal, for Minor.

C.L. (Mother) appeals from a judgment terminating her parental rights to her son (M.A.). She asserts the court erred in finding the parent-child relationship exception to termination of parental rights does not apply. We reject this contention and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On May 26, 2011, M.A. (Child), age 16 months, was taken into protective custody after the police executed a search warrant at his parents' home and found evidence of narcotics sales in a kitchen cabinet, including methamphetamine, a digital scale and packaging materials. Mother's credit card was found on top of the scale, and appeared to have been used to divide methamphetamine. Mother and Child's father, V.A. (Father), were arrested and incarcerated. The Health and Human Services Agency (Agency) filed a petition under Welfare and Institutions Code section 300, subdivisions (b) (failure to protect) and (g) (incarcerated and cannot arrange for care), and Child was declared a dependent of the court.[1] Mother's five-year-old daughter (Child's half-sister (Sister)) was also taken into protective custody, but she was released to the custody of her father (O.B.) with no dependency proceedings as to her.

The parents eventually pled guilty to child endangerment and possession of methamphetamine for sale. Mother was released from custody in August 2011 (about two months after Child's detention), and Father was released in May 2012 (about one year after Child's detention). They were both deported and were living separately in

---

[1] Subsequent unspecified statutory references are to the Welfare and Institutions Code.

2

Tijuana, Mexico. With the assistance of a Mexican social services agency, they were provided access to reunification services in Tijuana. As we shall detail below, over one and one-half years after Child was taken into protective custody, the parents had not reunified and services were terminated. Thereafter, the court terminated parental rights and established adoption as the permanent plan. The parents did not challenge the termination of reunification services. In the current appeal, Mother challenges the termination of her parental rights, arguing the court erred in finding the parent-child exception inapplicable. Father has not challenged the court's orders.[2]

*Reunification Attempts*

At the time of his arrest, Father had a criminal history related to drug activity, and he admitted he had used drugs in the past, including methamphetamine. During various interviews, Sister provided detailed observations indicating that Father, with Mother's knowledge, was selling drugs from the home. Nevertheless, at the time of their arrest, the parents denied this was occurring and instead claimed the drugs had been planted by Father's brother because of a fight between Mother and the brother's wife.

When Child was first taken into protective custody and placed in his initial short-term foster home, he cried extensively and called out for his parents, mainly for Mother. After about one week, the situation improved and he "warmed up" to the foster mother and the other child in the home. To help Child cope with the foster placement, he had visits with Sister about once or twice weekly, which Sister's father (O.B.) and O.B.'s

---

[2] We summarize the facts concerning Father only as needed to clarify Mother's case.

fiancée (W.Q.) arranged with the foster mother. Prior to Mother's incarceration, Mother's and O.B.'s families had regular interaction with each other concerning the children, and on August 19, 2011, Child was placed with O.B. and W.Q. Child adjusted well in the home. He called W.Q. " 'Mami' " and O.B. " 'Papi' "; his primary caretaker was W.Q.; and he was affectionate and trusting with the older children in the home (i.e., Sister and W.Q.'s two children, ages eight and 11). W.Q. and O.B. told the Agency that they were willing to adopt Child if he was not reunified with his parents.

As part of her reunification services, Mother started individual therapy in November 2011. In January 2012, Mother still denied knowledge of drug sales at the home, but acknowledged that Father may have been involved without her knowledge. In March 2012, about one year after her arrest, she finally admitted she knew Father was selling drugs, stating she had ignored the activity out of fear because he was a drug dealer and she did not want to be a single mother, and she recognized she had failed to protect her children. She also reported that Father had engaged in domestic violence on several occasions.

During this time period, Mother and the Agency communicated regularly by phone or e-mail; Mother began participating in reunification services through the Mexican social services agency; and her drug test results were negative. However, in February and April 2012, there were periods when Mother stopped communicating with the Agency; her cell phone was disconnected and she did not reply to e-mails; and she missed some of her therapy sessions. Also, although Mother said she was employed and living in an apartment by herself, she had not provided her address so that the Mexican

4

social services agency could conduct a home evaluation. When the Agency made contact with her in May 2012, the social worker told her to immediately contact the Mexican social services agency to give it her address and new phone number. In June 2012 the Mexican social services agency approved her home as appropriate for Child. Mother completed parent education and Narcotics Anonymous programs and continued to test negative for drugs. Mother developed a safety plan with her therapist that included a commitment not to reunify with Father and not to allow Father access to Child.

Mother was provided with regular visitation with Child. She had two visits with Child while she was in jail, and from August 2011 through March 2012 she had biweekly visits supervised by the Agency at the Mexican Consulate in Tijuana. In May 2012, Child's caretaker (W.Q.) began supervising Child's visits with Mother in Tijuana.

After his release from prison, Father was also provided with biweekly visits with Child supervised by the Agency at the Mexican Consulate. He contacted the Mexican social services agency about enrolling in services, but he never followed through by enrolling or participating in any services.

Child's caretakers taught Child that he had two mothers and two fathers, and Child called both sets of parents " 'Mami' " and " 'Papi' " (followed by their first names to distinguish them). The visits with Mother generally occurred at a park or restaurant. W.Q. reported that Child was happy to see Mother and hugged her; Mother was warm and affectionate with him; and Mother "understands what [Child] is saying, even when others cannot figure it out." However, Child, now age two, was by this point "extremely attached" to his caretakers, and he developed behavior problems associated with the visits

5

with Mother. During the visits with Mother, Child was vigilant that W.Q. not leave his side, and if W.Q. moved away from him he hugged her and held her hand. At the caretakers' home after visits with Mother, Child had tantrums and acted " 'clingy' " towards W.Q. For example, he anxiously followed W.Q. from room to room and did not want to be separated from her.

Because Child was having behavioral problems after his visits with Mother, the plan was to transition Child back to Mother by starting with unsupervised visits. However, in July 2012, Sister told the Agency's social worker and O.B. that on two occasions when she visited with Mother in Tijuana, Father had joined them at a restaurant. When the social worker asked Mother about this, Mother denied the man was Father, and claimed it was a " 'male friend.' " The Agency supervised a visit with Mother on August 4, 2012, and decided to proceed with the plan for short, unsupervised visits, but under the condition that Mother have no contact with Father and that she develop another safety plan with her therapist.

Problems developed in the wake of the two unsupervised visits that occurred in August and September 2012. During a home visit by the Agency's social worker several days after the August visit with Mother, Child began crying and stated he did not wish to visit Mother in Tijuana, and the social worker was unable to interview Child because he was so upset. During the September visit with Mother, Child did not want W.Q. to leave and she had to keep returning to comfort him, and he only interacted positively with Mother once he was confident W.Q. would not leave. For several days after the visits, Child ate less and only let W.Q. feed him; he cried at night and insisted that only W.Q.

6

put him to sleep; and he woke up during the night and wanted W.Q. In the morning he sought reassurance that W.Q. would remain at home, and during the day he sought emotional reassurance from W.Q. and O.B., saying that they did " 'not love him any longer.' " Because Child's separation anxiety from W.Q. had increased since the unsupervised visits, the Agency instructed W.Q. to continue arranging the visits with Mother but not to force Child to be unsupervised with Mother and to remain present during the visit if needed.

In a September 2012 report to the court, the Agency stated that although Mother had made positive progress in therapy, it recommended that Child be transitioned back to her home rather than be returned at that time. The Agency explained that it was hesitant to place Child with Mother because Mother may have had contact with Father, and the two unsupervised visits with Mother had triggered separation anxiety for Child.

In its September 2012 ruling, the court ordered that reunification services be continued for both parents; that Mother be provided with one (and then two) overnight visits for the next four weeks; and that thereafter a 60-day trial visit with Mother be considered. After the commencement of the overnight visits, Child's behavior problems initially continued; i.e., he cried and clung to W.Q. when she left him with Mother, and after the visits he cried, was clingy towards W.Q., and had difficulty eating and sleeping. However, W.Q. reported that as the overnight visits continued, Child did not fight as much when W.Q. dropped him off with Mother and became more willing to go with Mother. However, after the visits, Child's behavior problems continued, including tantrums, clinginess, and requiring constant reassurance from W.Q.

*Termination of Reunification Services*

After the overnight visits were started in September 2012, for the next several months Mother, for the most part, stopped communicating with the Agency. The Agency had been unable to reach her by phone or e-mail and had received no communications from her. Mother's therapist reported that Mother had missed her therapy sessions scheduled for September 25, October 3, and October 10; her cell phone and her uncle's phone were disconnected; and e-mails were returned as undeliverable. W.Q. and O.B. told the social worker that they communicated with Mother via Facebook to arrange the overnight visits with Child. Because of the lack of contact with Mother and other concerns, in October 2012 the Agency recommended against the 60-day trial visit with Mother at that point. As to Father, in October 2012 Father's brother notified the Agency that Father had left Tijuana and gone to his hometown in Michoacán, Mexico.

In November 2012, the Agency recommended that Mother's visits revert to being supervised; that Father continue with supervised visits; and that reunification services be terminated for both parents. Mother had not maintained contact with the Mexican social services agency and had not continued with drug testing. After being unable to contact Mother for over a month, the Agency's social worker gave a letter to W.Q. to deliver to Mother at the October 22 overnight visit. Because it had not heard from Mother, on October 26 the Agency cancelled Mother's overnight visits. Two weeks later, on November 9, 2012, Mother finally contacted the social worker and provided a new e-mail address.

Although Mother denied this, the Agency suspected that Mother had allowed Father to have access to Child, based on their Facebook pages indicating that they remained in a romantic relationship and displaying recent photos of Father with Child that were not taken during his supervised visitation at the Mexican Consulate. Although Mother claimed she was living at the same residence, the Agency noted that it had received returned mail sent to her address and for her visitations Mother had insisted on picking Child up at the border rather than have W.Q. bring him to Mother's home.

The Agency stated it no longer believed Mother had made substantial progress because it appeared she allowed Father to have access to Child even though she knew he had not received treatment; she was dishonest with the Agency; she failed to communicate with the Agency and her therapist for over a month; and she was not going to therapy or being drug tested. Also, Father had not participated in drug testing or substance abuse treatment with the Mexican social services agency, and the Agency did not know if he was using drugs or involved in drug sales, or if Mother planned to leave with Child to go to Michoacán with Father. Further, Child continued to have behavior problems after visits with Mother, including tantrums, clinginess, and insecurities. The Agency concluded that it was not appropriate "to remove [Child] from a stable, nurturing placement . . . in which he's remained for the past year and three months . . . with . . . [Sister] with whom he was previously raised . . . , to place him in an uncertain, possibly dangerous environment (if the mother remains in contact with the father), which is the mother's home." A CASA advocate who had been assisting with the case concurred with the Agency's recommendation, stating that it was "extremely

9

disappointing" that Mother had failed to maintain contact and had apparently allowed Father to have access to Child; Father had not received treatment for the issues that led to Child's removal; and the parents' recent lack of cooperation made it unlikely that Child's well-being could be monitored if reunification were to occur.

In November 2012, the court issued an interim order requiring that Mother's visits be supervised. Also, Mother's therapist discharged her from therapy because she had not been attending, and the Agency sent Mother an e-mail message recommending that she contact the therapist immediately to reinitiate services. Mother thereafter resumed therapy, and she told her therapist that she was living with her aunt and she had not given Father access to Child. However, other than an e-mail on December 22, Mother did not communicate with the Agency. Mother had not provided her new address to the Mexican social services agency for a home evaluation, and Mother had not continued with her drug testing.

In January 2013, Father e-mailed the Agency reporting that he was back in Tijuana, but the Agency had no further communications from him that month even though it attempted to contact him by phone and e-mail.

On January 22, 2013, the court terminated reunification services and set the matter for a section 366.26 permanency planning hearing.

*Termination of Parental Rights*

In 2013 Mother and Father continued their supervised visits with Child, now age three, and Child continued to say that he had two "momm[ies]" and "dadd[ies]." W.Q. reported that Child interacted well with Mother; he smiled and did not cry or show

10

resistance when Mother picked him up; and he continued to call Mother " 'mama [C.].' " However, when the visits ended, Child did not display any discomfort at leaving Mother, and he indicated that he wanted to go with W.Q. During a visit with Mother supervised by the Agency at the Mexican Consulate, Child began to whimper when he was told the visit was ending, but he stopped crying when his attention was redirected, and when they were leaving he gave Mother a kiss and hug and there were no other concerns. During another visit with Mother supervised by the Agency, Child did not cry or express distress about leaving Mother.

In March 2013, an Agency social worker recommended that Child not start a Head Start program because "due to the trauma of being separated from his biological mother at the age of [16] months" he was not "emotionally ready to be separated from his foster mother for several hours" in a classroom environment. During visits at the caretakers' home, the CASA advocate observed that Child appeared calm and playful, and he no longer appeared to be overly anxious to be held or reassured by W.Q.

W.Q. and O.B. told the Agency's social worker that they were very attached to Child and saw him as part of their family. When the social worker explained the differences between adoption and guardianship, they opted for adoption.

The Agency assessed that although Child had a parent-child relationship with Mother and Father and he enjoyed visiting with them, the parent-child relationship was stronger with Child's caretakers who had been acting in a parental role for Child for the last two years. The Agency concluded that Child had suffered from the initial separation from his parents; he had now reached stability in his current placement; keeping this

11

stability should be the main goal; and his development could be negatively impacted if his emotional stability continued to be disrupted. Further, he would suffer "minimal to no impact" if parental rights were terminated, and the benefits of adoption—including stability, permanency, and a "family he can call his own"—outweighed any possible effects Child might experience from termination of parental rights. The social worker commented that Child could benefit from future contacts with his biological parents, and noted the caregivers were willing to allow future contacts on birthdays and other occasions. The CASA advocate concurred, stating that although Child had a "positive and affectionate relationship" with his biological parents and contact with them was beneficial, he needed a stable, permanent home and he was "extremely attached" to his caregivers, particularly W.Q.

At a hearing in May 2013, Child's counsel, with the concurrence of the parents' counsel, requested that the court consider guardianship rather than adoption, and told the court that arrangements were being made for a bonding study in Mexico. However, at a subsequent hearing in July, Child's counsel told the court that she had changed her position and was supporting the Agency's recommendation of adoption.

Mother testified telephonically at the permanency planning trial held in July and August 2013.[3] She testified that Child gets upset at the visitations when he has to leave her to return to San Diego; although he sees W.Q. as a "maternal figure" he prefers being

---

[3]    Father did not personally appear but was represented by counsel.

with Mother; he "gets very sad" when he is not with Mother; and he would be affected "very deeply" if he no longer visited with Mother.

After considering the evidence and hearing argument, the court found Child was likely to be adopted if parental rights were terminated, and the parents had not established any of the statutory exceptions that made termination of parental rights detrimental to Child. Accordingly, the court terminated parental rights and referred Child for adoptive placement. The court stated that despite periods of interruption, both parents had made ongoing efforts to stay in contact with Child. Nevertheless, the evidence did not show that continued contact with either parent was so important to Child's well-being that it outweighed the benefits of adoption; rather, the evidence showed that Child would suffer significant emotional detriment if he were denied the permanence of adoption. The court explained that Child was extremely vulnerable to future separations and change due to the trauma that he experienced when he was separated from his parents at 16 months of age. This vulnerability was shown by his clinginess to W.Q. during visits with Mother; his behavior problems associated with the visits; and the recent recommendation that he not start a Head Start program because he could not handle being separated from W.Q. in a classroom environment. He had been with his current caretakers for 27 months; it had taken all these months for him to begin to stabilize and heal; it was clear he was very attached to his current caretakers; and the court had to be "very careful" not to disrupt the "delicate balance" that he had achieved.

The court recognized that Child indicated he had "two mommies and two daddies" and that he was fond of his parents and had a bond with them. However, the court

reasoned that the "reality is that he now separates easily from" Mother, and he did not have anxiety separating from either parent. The court concluded there was no evidence that the bond with his parents was so strong that he would suffer detriment from the loss of the relationship; the evidence showed he would be "harmed gravely" by the loss of his current stability; and his need for permanence and stability "far outweighs" the bond that he currently had from the visits with his parents.

DISCUSSION

Mother argues there is insufficient evidence to support the court's decision not to apply the exception for termination of parental rights based on a beneficial parent-child relationship. She contends the only reasonable inference that can be drawn from the record is that Child will suffer great emotional harm if his relationship with Mother is terminated; the record cannot support the finding that the benefits of adoption outweighed the benefits from a continuing relationship between Child and Mother; and the court should have ordered guardianship with continued parental contact.

Under the dependency statutory scheme, the "parent's interest in having an opportunity to reunify with the child is balanced against the child's need for a stable, permanent home. The parent is given a reasonable period of time to reunify and, if unsuccessful, the child's interest in permanency and stability takes priority." (*In re Marilyn H*. (1993) 5 Cal.4th 295, 309.) Once reunification services have been terminated and the case is at the permanency planning stage, adoption is the preferred plan. (*In re Celine R*. (2003) 31 Cal.4th 45, 53.) " 'Adoption is the Legislature's first choice because it gives the child the best chance at a [a full] emotional commitment from a responsible

14

caretaker.' [Citation.] 'Guardianship, while a more stable placement than foster care, is not irrevocable and thus falls short of the secure and permanent future the Legislature had in mind for the dependent child.' " (*Ibid.*) If there is clear and convincing evidence that the child is likely to be adopted, the burden shifts to the parent to show that there is "a compelling reason for determining that termination [of parental rights] would be detrimental to the child" due to a statutorily-specified exceptional circumstance. (§ 366.26, subd. (c)(1)(B); *In re C.F.* (2011) 193 Cal.App.4th 549, 553.)

Under the parent-child relationship exception to termination, detriment to the child may be shown if the "parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) This exception applies when the parent-child relationship "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)

On appeal, we review the trial court's factual findings for substantial evidence, and evaluate the court's finding on the detriment issue for abuse of discretion. (*In re K.P.* (2012) 203 Cal.App.4th 614, 621-622.) We draw all reasonable inferences and resolve

all conflicts in favor of the court's ruling, and reverse only if no judge could have reasonably made the order. (*In re Autumn H., supra*, 27 Cal.App.4th at p. 576; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.)

The record supports the court's conclusion that Mother did not show that termination of her parental rights would cause detriment to Child that outweighed the benefits from a permanent plan of adoption. The evidence supports that by the time of the permanency planning hearing, Child was fully emotionally attached to W.Q. and O.B. who had been taking care of him for two years; he looked to them to comfort and reassure him whenever he experienced emotional distress; and he became highly anxious if it appeared he might be separated from W.Q. Although Child's anxiety when separating from W.Q. to stay overnight with Mother had started to diminish, he still exhibited behavior problems after the overnight visits. Further, the overnight visits were halted when Mother stopped communicating with the Agency and the Agency suspected she had allowed Father access to Child. Thus, the plans to transition Child to placement with Mother had been interrupted; Child remained highly attached to W.Q.; and his reactions demonstrated that a stable placement with W.Q. was essential to his emotional well-being. To the extent Mother testified to the contrary at the hearing on termination of parental rights, the trial court was not required to credit her testimony.

Mother argues that the fact that Child may have been more attached to W.Q. and O.B. than to Mother and Father does not suffice to show the parent-child relationship exception is inapplicable. She asserts that Child's "strong relationship with the caregivers [did not] negate the harm [he] would experience from the loss of his significant, positive,

16

emotional relationship with his mother, and for that matter, his father." The record shows no error in this regard. The strength of Child's attachment to his caregivers was only one factor considered by the court; the court also considered whether termination of parental rights would cause detriment to Child, and the court ruled that it would not. The record supports this finding. The evidence reflects that Child had been taught that he had two mothers, he was emotionally fond of Mother, and he sometimes expressed reluctance when visits with Mother were ending. Nevertheless, the court reasonably determined that he now viewed W.Q. as the primary mother-figure in his life; separation from W.Q. caused him significant stress; and separation from Mother caused him no emotional trauma. The court also reasonably assessed that because Child had already suffered severe trauma when he was separated from Mother at age 16 months, it was not appropriate to again create the potential for separation by maintaining Mother's parental rights even though she had not reunified for more than two years after Child's removal.

Mother also asserts that it was undisputed that Child would benefit from continued contact with his parents, and that termination of parental rights did not guarantee this continued contact notwithstanding the caregivers' statements that they would allow contact. The contention fails because the parent-child exception "does not permit a parent who has failed to reunify with an adoptable child to derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent." (*In re Jasmine D., supra*, 78 Cal.App.4th at p. 1348, italics added; *In re C.F., supra*, 193 Cal.App.4th at pp. 558-559.) Rather, the court must *balance* the benefit of a continuing relationship with the benefits of adoptive

17

placement to determine "whether a child would be *so harmed* by terminating a relationship with a natural parent that an adoption should not go forward and the permanent plan should be diverted to guardianship or foster care." (*In re Jasmine D., supra*, 78 Cal.App.4th at pp. 1347-1348, italics added.) As stated, the court reasonably found that in this case the balance tipped in favor of adoption based on Child's history of separation trauma, the high anxiety he experienced when separated from W.Q., and his ability to separate from Mother without undue distress.

Finally, Mother's assertion that the court was compelled to select guardianship with maintenance of her parental rights is unavailing. Adoption affords a child a higher level of permanency and security than guardianship. (*In re Celine R., supra*, 31 Cal.4th at p. 53.) The court did not abuse its discretion in concluding that Child needed the permanency and security of adoption more than he needed an ongoing parental relationship with his biological parents.

DISPOSITION

The judgment is affirmed.


HALLER, J.

WE CONCUR:


HUFFMAN, Acting P. J.


McINTYRE, J.

18